FILED

2009 Dec-30  PM 04:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ANTONIO GREEN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:08-CV-1718-VEH** |
| | ) |
| **NORFOLK SOUTHERN** | ) |
| **CORPORATION,** | ) |
| | ) |
| **Defendant.** | ) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Antonio Green initiated this job discrimination lawsuit on September 17, 2008, relating to his employment with Defendant Norfolk Southern Corporation ("Norfolk"). (doc. 1). In his Complaint, Mr. Green alleges he was wrongfully terminated from his employment because of his race, African American, and his sex, male. Mr. Green filed an Amended Complaint on November 24, 2008, and asserts two claims for race discrimination, under 42 U.S.C. § 1981 ("§ 1981") (Count I) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") (Count II) respectively, and a claim for sex discrimination under Title VII (Count III). (doc. 10). After the close of discovery, he filed a motion requesting that Counts II and III of the Amended Complaint be dismissed with prejudice. (doc. 17). The court, by margin order, granted Mr. Green's motion on June 9, 2009.

Consequently, only his claim of race discrimination under § 1981 (Count I) remains to be adjudicated. That claim is the subject of a Motion for Summary Judgment (doc. 19) by Norfolk.

After careful consideration of the motion, the parties' briefs, and the evidence of record, this court concludes that Norfolk's Motion for Summary Judgment is due to be **GRANTED**.

## I.      Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue

2

for trial.  *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant.  *See, e.g., Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See, e.g., Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.* facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant,

3

probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged

evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## II.   Facts[1]

Mr. Green was employed by Norfolk as a "certified locomotive engineer." Norfolk operates a freight railroad that runs throughout North America, including Alabama.  Norfolk employs approximately 29,000 people.  Mr. Green was hired by Norfolk in 1999 as a "conductor trainee." He became a "certified locomotive engineer" in November 2005.  At the time of his termination, Mr. Green worked in

---

[1] Whenever the facts are in dispute, they are stated in the manner most favorable to the non-moving party.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Therefore, these are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

Appendix II to this court's Uniform Initial Order, entered in this case on February 6, 2009 (doc. 13), sets out the requirements that parties must follow when moving for or opposing summary judgment.  Therein, a party opposing summary judgment is cautioned that "*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*"  (doc. 6, at p.16) (emphasis in original).  Therefore, where Mr. Green (as the opposing party) did not expressly dispute a statement of fact offered by Norfolk, that fact has been deemed to be admitted for summary judgment purposes.  Whenever Mr. Green adequately disputed a fact offered by Norfolk, the court has accepted his version.

The court notes that the material facts of this lawsuit, as determined by the substantive law, are not in dispute.

5

Norfolk's Transportation Department out of Norris Yard,[2] which is near Birmingham, Alabama.

A typical train crew consists of an engineer, such as Mr. Green, and a conductor. The engineer and conductor are each individually responsible for the safe operation of the train. Mr. Green was terminated from his employment following an incident on November 18, 2006, during which it is undisputed that he operated a train in an unsafe manner.

Engineers and conductors must obey all signal indicators. Signal indicators display commands to engineers and conductors regarding the train's movement. Those indicators are located to the side of the railroad tracks so that they are visible to a train's crew. Mr. Green, as an engineer, was "schooled, tested and trained on the job in the recognition of and reaction to various signals relating to train operation." (doc. 20, at p.7).

On November 18, 2006, Mr. Green and a conductor, Joshua Simmons,[3] were operating Train 154A out of Birmingham, Alabama. The train was traveling east to Atlanta, Georgia. After leaving Birmingham on the main track, Train 154A was directed by signal indicator to proceed down a stretch of track called the "siding" at

---

[2] Norris Yard is the main terminal for Norfolk in its Alabama Division.

[3] Mr. Simmons is Caucasian.

6

Heflin, Alabama, so that a westbound Amtrak passenger train could pass along the main track. In other words, Train 154A and the Amtrak passenger train were traveling along a collision course on the main track, and Train 154A was directed to yield to the Amtrack train by using an alternate track. After switching from the main track to the Heflin siding, the crew of Train 154A was signaled to reduce the train's speed and prepare to stop at the next signal, which was located approximately two miles away at Owens, Alabama. The Owens signal is at the end of the Heflin siding. Once a train passes the Owens signal it enters the main track.

Train 154A did not slow down as instructed. Rather, the crew increased the train's speed from 25 miles per hour to 28 miles per hour. At the Owens signal, Mr. Green observed a "Stop" signal command. A "Stop" signal requires that the train come to a complete stop before any part of the train passes the signal indicator. Train 154A was traveling at 28 miles per hour when Mr. Green saw the "Stop" signal. Mr. Green immediately applied the emergency brakes; however, Train 154A passed the "Stop" signal by 262 feet and came to a rest "in the foul" of the main track. Norfolk explains that the phrase "in the foul" means "that while Train [] 154A did not actually re-enter [sic] the main track where the Amtrak passenger train was then approaching, it stopped so close to the main that if the Amtrak train has not stopped, it would have struck the forward portion of Train [] 154A." (doc. 20, p.12). In other words, the

7

actions of the crew of Train 154A necessitated that the Amtrak passenger train also stop in order to avoid a collision.

Failing to heed a signal is known as a "Red Board violation," and is considered by Norfolk to be a major rule violation. It is undisputed that Mr. Green was aware, throughout the time he was employed by Norfolk, that any employee could be fired for a Red Board violation. After the incident of November 18, 2006, both Mr. Green and the conductor, Joshua Simmons, faced disciplinary action.

As was the usual and customary practice, Norfolk conducted an investigation into the incident. A hearing regarding Mr. Green's Red Board violation was held on November 30, 2006. Daniel Moon, a "Terminal Superintendent," served as the hearing officer. As the hearing officer, Mr. Moon was empowered by Norfolk to decide on the imposition of discipline. Mr. Green was represented at the hearing by two union officials who were permitted to ask questions, cross examine witnesses, introduce documents and other evidence, and object to evidence and documents offered by Norfolk.

During the hearing, Mr. Green conceded that he committed a Red Board violation. He argued, through his union representatives, that he should be excused from the violation "because some trees, brush and part of a dirt bank had been removed from an area of the Heflin siding. . . . Mr. Green contended that he had been

8

expecting to see those trees and brush as a reference point as he was approaching the end of the siding." (doc. 20, p.12) (citing Def. Ex. 17).[4]

Mr. Moon did not accept Mr. Green's excuse, and concluded that the removal of debris and foliage actually improved visibility of the signal to the crew of Train 154A. Following the November 30, 2006, hearing, Mr. Moon determined that Mr. Green and Mr. Simmons were culpable for committing a Red Board violation. Norfolk terminated their employment on December 7, 2006.

Consistent with their rights and with the practices at Norfolk, both Mr. Green and Mr. Simmons appealed their terminations to a Public Law Board. The Public Law Board, which consists of a representative of Norfolk, a union representative, and a neutral arbitrator, is vested with the authority to sustain, modify, or reverse the hearing officer's decision pursuant to the Railway Labor Act, 45 U.S.C. § 153. The decision of the Public Law Board is final and binding on all parties. The Public Law Board reversed Mr. Simmons's termination. Mr. Green's termination was sustained.

In its written decision sustaining Mr. Green's termination, the Public Law Board offered the following statement with regard to the November 18, 2006, incident:

---

[4] Defendant's Exhibit 17 is the deposition of Steve L. Nichols, taken on May 28, 2009. (doc. 21-18).

9

Claimant admitted the charges lodged against him at the investigation. He testified that he saw the signal in question but did not reduce his speed, was unable to stop and was required to place the train in emergency when it failed to slow in time. Although the signal was prominently displayed from 800 feet away, Claimant took no action to stop the train until it was 495 feet away and it then took him 758 feet to stop. Nor does he explain how he neglected to notice that his train was increasing speed after it passed the Diverging Approach. As testified to by Trainmaster Steve Smith, engineers are not taught to operate by landmarks and in this instance the clearing work had been done approximately two months earlier. Third, Claimant was accountable for the safe operation of the train. He offers no excuse for failing to monitor his speed after passing the Diverging Approach. Pulling 7,773 tons, he put his train to within 730 feet of an Amtrak train coming in the opposing direction.

(doc. 20, p.10).

The basis for this case is Mr. Green's contention that he was more severely disciplined for a Red Board violation than similarly situated Caucasian conductors and engineers. Because of that, he claims to have been discriminated against on the basis of his race by Norfolk.

**III.   Discussion**

The elements of proof for a § 1981 claim are essentially the same as for a Title VII claim. *See*, *e.g.*, *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (describing § 1981 as "a parallel remedy against discrimination which . . . derive[s] its legal principles from Title VII") (quoting *Blum v. Gulf Oil*

*Corp.*, 597 F.2d 936 (5th Cir. 1979)).[5]   Indeed, the Eleventh Circuit has long

recognized that when "a plaintiff predicates liability under Title VII on disparate

treatment and also claims liability under sections 1981 and 1983, the legal elements

of the claims are identical."  *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir.

1985).  *See also*, *e.g.*, *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 949

(11th Cir. 1991) ("Section 1981 requires proof of *intentional* discrimination. . . . The

Supreme Court has held that the test for intentional discrimination in suits under §

1981 is the same as the formulation used in Title VII discriminatory treatment

cases.") (citations omitted) (emphasis in original); *Palmer v. District Board of*

*Trustees of St. Petersburg Junior College*, 748 F.2d 595, 596 n.2 (11th Cir. 1984)

(same).  Accordingly, this court will analyze Mr. Green's § 1981 claim under the

legal framework for a Title VII race discrimination claim.

Proving that an employer relied on a plaintiff's race when terminating his

employment is rarely a straightforward undertaking.  Stated differently, a plaintiff's

case generally rests entirely on circumstantial evidence because direct evidence of an

employer's intent or motivation often is either unavailable or difficult to acquire.  *See*

*Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1071 (3rd Cir. 1996) (*en*

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*banc*).[6]  Such is the case here.

Federal courts typically evaluate the sufficiency of circumstantial evidence using some variant of the framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department*

---

[6] Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption.  *See, e.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (holding that the term "direct evidence," when used in the context of a Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption"); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (same); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same); *Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir. 1982) ("Where the evidence for a *prima facie* case consists . . . of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the *prima facie* evidence the ultimate issue of discrimination is proved; no inference is required."). *See generally Black's Law Dictionary* 577 (7th ed. 1999) (defining "direct evidence" as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

In the context of employment discrimination cases, direct evidence of an employer's intent to discriminate on the basis of some prohibited characteristic is more specifically defined as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'"  *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter*, 132 F.3d at 641 (in turn quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)).  As such, "direct evidence of discrimination is powerful evidence capable of making out a *prima facie* case essentially by itself."  *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (*per curiam*).  In summary, "[t]o amount to direct evidence, a statement must: (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus."  *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).  No piece of evidence before this court meets the criteria for "direct" evidence.

*of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  As Justice O'Connor observed in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), "the entire purpose of the *McDonnell Douglas prima facie* case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Id.* at 271 (O'Connor, J., concurring).

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *See McDonnell Douglas*, 411 U.S. at 802; *see also Burdine*, 450 U.S. at 253-54 & n.6.  The plaintiff's burden to initially satisfy the elements of a *prima facie* case is not great.  *See Burdine*, 450 U.S. at 253 ("The burden of establishing a *prima facie* case . . . is not onerous."); *see also*, *e.g.*, *Turlington v. Atlanta Gas Light Co.*, 153 F.3d 1428, 1432 (11th Cir. 1998) ("[A] plaintiff's burden in proving a *prima facie* case is light."); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (*per curiam*) ("Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination.").

"The effect of the presumption of discrimination created by establishment of the *prima facie* case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell*

13

*Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254); *see also*, *e.g.*, *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (same).

To rebut the presumption of intentional discrimination, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255.  If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *id*. at 257, the presumption of discrimination created by the *prima facie* case "drops from the case," and "the factual inquiry proceeds to a new level of specificity."  *Id.* at 255 & n.10.

The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination.  *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804).  *Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding in the context of a Rule 50 motion that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to

14

conclude that the employer unlawfully discriminated.").  If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

### A.    Race Discrimination

A *prima facie* case of race discrimination requires proof of four elements:  (1) Mr. Green is a member of a protected class; (2) "he was subjected to [an] adverse employment action; (3) [Norfolk] treated similarly situated non-minority employees outside his classification more favorably; and (4) [Mr. Green ]was qualified to do the job." *Holifield*, 115 F.3d at 1562.  In the present case, Norfolk does not dispute that the first and second elements of the *Holifield* inquiry are satisfied: Mr. Green is a member of a protected class, African American, and he suffered the adverse employment action of termination.  Norfolk focuses its arguments on the third and fourth prongs of the inquiry.[7]

---

[7] In termination cases — as contrasted to cases involving an employer's failure to hire or promote — the question of whether a plaintiff was qualified to perform the duties of his or her job is not often an issue.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).  The Eleventh Circuit has recognized that, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred."  *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987); *see also Pace v. Souther Railway Sys.*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983) (same).  In the present case, it is undisputed that Mr. Green performed his job as

Turning to the third prong, Norfolk contends Mr. Green has not shown that there are similarly situated persons outside of his protected group who were disciplined less harshly for Red Board violations.  Mr. Green, of course, challenges that assertion.  After reviewing the evidence of record in a light most favorable to Mr. Green, and resolving all issues of fact in his favor, the court agrees with Norfolk.

"In determining whether [other employees] are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maynard v. Bd. of Regents of the Div. of Universities of the Florida Dept. Of Edu.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (quoting *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998)).  "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishment imposed."  *Id*. (quoting *Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001)).

In support of its Motion for Summary Judgment, Norfolk directs this court to

---

a certified locomotive engineer for Norfolk from November 2005 until his termination in December 2006.  Because Mr. Green held the same position for approximately one year before the incident that led to his discharge, the court infers that he was qualified to perform the job of a certified locomotive engineer.  Therefore, Norfolk's argument that Mr. Green was not qualified to perform his job is rejected.

evidence regarding the discipline imposed on conductors and engineers who committed Red Board violations while simultaneously questioning whether conductors are similarly situated to engineers for purposes of a race discrimination claim.  Mr. Green, in making his arguments in opposition to summary judgment, treats conductors and engineers as being similarly situated for purposes of his opposition.  (doc. 24, pp. 7-8).  This court, however, need not reach the issue of whether conductors are similarly situated with engineers.   Whether the court examines the discipline handed down by Norfolk to engineers alone or to engineers and conductors, Mr. Green cannot establish a *prima facie* case of race discrimination.  Therefore, for purposes of this court's analysis, conductors and engineers who committed Red Board violations will be treated as similarly situated comparitors to Mr. Green.

In 2005, the year before Mr. Green's Red Board violation, seven Caucasian engineers and conductors received suspensions (they were not terminated) for committing Red Board violations.  Also in 2005, an African American engineer received a suspension for committing a Red Board violation.  The undisputed evidence before this court is that, regardless of race, those engineers or conductors who committed Red Board violations in 2005 received suspensions.  (doc. 21-26, pp. 4-22).

In 2006,[8] discipline for Red Board violations became more varied. (doc. 21-26, pp. 24-46). An African American engineer, a Caucasian conductor, and a Caucasian conductor trainee received no discipline for Red Board violations committed in January 2006. In April and June 2006, an African American engineer was discharged while an African American conductor, a Caucasian conductor, and a Caucasian engineer received suspensions for committing Red Board violations. All other Red Board violators, including Mr. Green, were discharged by Norfolk in 2006. Of those four individuals, three were Caucasian employees. In short, during the year in which Mr. Green committed a Red Board violation, two African American employees and three Caucasian employees were dismissed for such offenses. Also in 2006, members of Mr. Green's protected class were suspended or received no discipline for Red

---

[8] On September 26, 2006, Mark D. Manion, Vice President of Operations for Norfolk, distributed a written notice throughout the company. The notice warned train crews that if they were found guilty of committing a Red Board violation, they would be subject to dismissal. Mr. Green, who received the Manion notice prior to his November 18, 2006, Red Board violation, understood that Red Board violations "would be taken more seriously than they had been before." (doc. 20, p.9) (quoting Green Depo., pp. 100-101).

The parties argue over the significance of the Manion notice. Norfolk posits that the Manion notice constituted a change in corporate policy such that termination for Red Board violations would become the norm. Mr. Green contends that the Manion notice did not change Norfolk's policy because dismissal was always a possibility, before or after the notice was issued. There is evidence of record to support both positions. In construing the facts in a light most favorable to Mr. Green, the court will proceed as though the Manion notice did not change Norfolk's disciplinary policy. That said, the evidence is undisputed that Norfolk imposed only the discipline of termination on those engineers and conductors — both Caucasian and African American — who committed Red Board violations after September 2006.

18

Board violations.

After September 2006, Norfolk did not decline to discipline or suspend individuals who committed Red Board violations. In 2007-2008, Norfolk discharged all of the fourteen conductors or engineers (excluding those who voluntarily resigned or retired from Norfolk's employ) who were found guilty of Red Board violations.[9] (doc. 21-26, pp. 48-84). Of those individuals, ten are Caucasian and four are African American.

In consideration of the undisputed evidence of record, Mr. Green has failed to show that he was disciplined more harshly for the same offense than non-minority employees outside of his protected class. Between the years 2005-2008, members of Mr. Green's protected class received either no discipline, suspension, or termination for Red Board violations. Norfolk's Caucasian conductors and engineers also received the same sort of discipline for similar violations over the relevant time

─────────────────────

[9] It is worthy of note that, of the fourteen employees who were dismissed between September 2006 and December 2008, the Public Law Board overruled Norfolk's decision to terminate twelve of those individuals. In other words, twelve of the fourteen had their employment with Norfolk reinstated by the Public Law Board. The two exceptions are Mr. Green and Stephen M. Davidson, who is Caucasian. In this case, there is no evidence before this court to suggest that Norfolk has a controlling influence over the actions of the Public Law Board. To the contrary, the Public Law Board appears to be a wholly separate, statutorily created entity. Therefore, the actions of the Public Law Board are immaterial to the issue presently before this court: whether Norfolk discriminated against Mr. Green on the basis of his race. The issue before this court is the discipline imposed by Norfolk for Red Board violations, not whether that discipline withstood the independent scrutiny of the Public Law Board.

period.  Furthermore, Norfolk uniformly terminated the employment of all engineers and conductors who committed Red Board violations after September 2006, without regard to race.  Mr. Green has, therefore, failed to meet his burden to make out a *prima facie* case of race discrimination under § 1981.  *See Holifield*, 115 F.3d at 1562.

Assuming, *arguendo*, that Mr. Green had made out a *prima facie* case, summary judgment is nevertheless due to be granted in Norfolk's favor.  Norfolk has presented a legitimate, non-discriminatory reason for terminating Mr. Green's employment.  It is undisputed that Mr. Green, as a member of the train crew on Train 154A, was responsible for the train, its passengers, and its cargo.  By committing the Red Board violation on November 18, 2006, Mr. Green unquestionably endangered Train 154A as well as the passengers aboard the oncoming Amtrak train, which had to make an emergency stop to avoid a collision after Train 154A ran beyond the Owens "Stop" signal.  The violation was a terminable offense, despite the fact that Norfolk had, in the past, imposed less severe discipline.  Norfolk has offered undisputed evidence that it discharged Mr. Green for committing the Red Board violation and has thus presented a legitimate, nondiscriminatory reason for its action.

As a result, the burden shifts to Mr. Green to "come forward with evidence, including the previously produced evidence establishing the *prima facie* case,

sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804). There is no evidence of pretext before this court. Mr. Green's deposition testimony is that he knew, from the beginning of his employment in 1999, that he could be fired for committing a Red Board violation. On November 18, 2006, he admittedly did just that, and Norfolk terminated his employment. The evidence is not that Mr. Green was the only employee who was terminated for such an offense while all other employees who committed such an offense received suspensions or no discipline at all. The evidence is not that Norfolk engaged in a practice of terminating African American engineers and conductors for Red Board violations while doling out less severe discipline to similarly situated Caucasian employees. Rather, the undisputed evidence is that, between 2005 and early-2006, Norfolk imposed a range of discipline – from none whatsoever to termination – on engineers and conductors who were guilty of Red Board violations. After September 2006, Norfolk fired every Red Board violator, regardless of race. In light of the factual record before this court, no reasonable fact finder could conclude that Norfolk discriminated against Mr. Green on the basis of his race by terminating his employment.

21

**IV.**   **Conclusion**

For the reasons stated herein, Norfolk's Motion for Summary Judgement is due to be **GRANTED**.  A separate Order consistent with this Memorandum Opinion will be entered.

**DONE** this 30th day of December, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

22